IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, SOUTHERN DIVISION

| | | |
|---|---|---|
| RORY M. DAUGHTRY, | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
|     v. | ) | 1:11cv153-MHT |
| | ) | (WO) |
| ARMY FLEET SUPPORT, LLC, | ) | |
| et al., | ) | |
| | ) | |
|     Defendants. | ) | |

MEMORANDUM OPINION

Plaintiff Rory M. Daughtry brought this action
charging failure to accommodate his disability in
violation of federal and state laws and naming as
defendants Army Fleet Support, LLC (his employer), L-3
Communications Corporation (Army Fleet's parent company),
ACE American Insurance Company (L-3's workers'
compensation insurer), ESIS, Inc. (ACE's third-party
claims administrator), Tammie Maddox (an Army Fleet
employee), Michelle Kelton and Ruth Mann (ESIS
employees), and the International Association of
Machinists and Aerospace Workers, District 75 (Daughtry's

union).  Daughtry asserts claims under the Americans with Disabilities Act of 1990 (ADA), as amended (42 U.S.C. §§ 12111-12117), and the Racketeer Influenced and Corrupt Organizations Act (RICO) (18 U.S.C. §§ 1961-1968), and he asserts state-law claims of estoppel, conspiracy, breach of contract, negligence and wantonness, outrage, and invasion of privacy.  Jurisdiction is proper under 28 U.S.C. §§ 1331 (federal question) and 1367 (supplemental jurisdiction) and 42 U.S.C. § 12117 (ADA).

The case is now before this court on the defendants' motions for summary judgment.  The motions will be granted.


## I. SUMMARY-JUDGMENT STANDARD

"A party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and

the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   The court must view the admissible evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party.  <u>Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

Under Rule 56, the party seeking summary judgment must first inform the court of the basis for the motion, at which point the burden then shifts to the non-moving party to demonstrate why summary judgment would not be proper.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986); <u>see also</u> <u>Fitzpatrick v. City of Atlanta</u>, 2 F.3d 1112, 1115-17 (11th Cir. 1993) (discussing burden-shifting under Rule 56).   The non-moving party must affirmatively set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials in the pleadings.  Fed. R. Civ. P. 56(e).

## II. BACKGROUND

Fort Rucker is a U.S. Army post in southeastern Alabama. There, the Army contracts with Army Fleet, a private company, for the provision of aircraft maintenance and logistical services. The company employs almost 4,000 active employees, the vast majority of whom are union members and aircraft mechanics. Until recently, Daughtry was both. After years of fixing Army helicopters, Daughtry suffered an injury to his left shoulder that required surgery and subsequent physical therapy. In his final week of therapy, he suffered a second injury to the same shoulder, necessitating another round of surgery. Responding to complaints of regular shoulder pain, his doctor ordered him to refrain from lifting items over 20 to 25 pounds. When Daughtry's pain continued, the doctor decreased the permitted amount to 15 pounds.

After Daughtry's injury and corresponding lifting restrictions, Army Fleet attempted to accommodate him;

4

rather than requiring him to continue carrying out all his duties as an aircraft mechanic, he was assigned solely to "parts-turn-in," one of many duties that are required of aircraft mechanics.  When handling parts-turn-in duties, the mechanic receives items of various sizes and weights that have been turned in by other employees and shelves them in designated areas.  Because some of the items Daughtry had to shelve exceeded 15 pounds, he sometimes required assistance from coworkers. In general, Army Fleet does not staff employees permanently at the parts-turn-in area; the work is handled on an assignment basis only by aircraft mechanics who are primarily responsible for other duties, including, most importantly, repairing aircrafts.  In allowing Daughtry to forgo all his other duties, the company made an exception to that general rule.

Daughtry worked in the parts-turn-in area exclusively for a couple years.  Then, a realignment at Fort Rucker, whereby Army Fleet had to move employees in response to

the government's changing needs, ended that.   Daughtry
had been working during what the parties call "regular
work week."   After Army Fleet employees were moved around
pursuant to the realignment, Daughtry was "bumped" to
"odd work week" in accordance with his seniority in the
union.   He had no objection to the move; it was, he
believed then and seems to believe now, in accordance
with the collective-bargaining agreement (the agreement
between Army Fleet and the union).   After Daughtry was
moved to the odd work week, however, Army Fleet concluded
that there was not a need during that time for him to
work in the parts-turn-in area.   All needed parts-turn-in
duties were handled by persons with greater seniority in
the union than Daughtry.   As there was no longer a need
for parts-turn-in work and as Daughtry was physically
restricted from handling the other aspects of the
aircraft-mechanic position, the company decided that it
could not continue to employ him in that job. Army Fleet
temporarily   assigned   Daughtry   to   light-duty   work

6

reviewing certain log books while the company searched for a permanent position.

The company decided that, despite Daughtry's physical restrictions, he would be able to satisfy the needs of the "aircraft monitor" position.  Aircraft monitors, generally speaking, are tasked with standing near aircrafts and assuring that only permitted persons approach.  The job requires little physical exertion; it also pays far less than Daughtry's prior job as an aircraft mechanic.  Faced with the option of an indefinite layoff or less pay, Daughtry begrudgingly accepted a position as an aircraft monitor.

In accordance with the collective-bargaining agreement, Daughtry (represented by union counsel) filed several grievances against the company regarding the new position with less pay.  He contended that, under the agreement (which has language relating to reasonable accommodations for disabilities that closely tracks the language of the ADA), Army Fleet was required to

7

accommodate his injuries by creating a permanent position of parts-turn-in work that would pay the same amount as aircraft-mechanic jobs.   In other words, he wanted to continue the pre-realignment status quo, when he held the aircraft-mechanic position but was not required to carry out any of the job's duties besides parts-turn-in.   The grievances proceeded to arbitration, and the arbitrator ruled against Daughtry.   Additionally, Daughtry filed a complaint with the U.S. Department of Labor's Office of Federal Contract Compliance Programs, which also ended in an unfavorable decision.   Lastly, he filed a state-court case relating to, among other things, workers' compensation benefits.

Throughout those proceedings, Daughtry continued to work as an aircraft monitor.  However, that ended when he injured his previously uninjured right shoulder.  As with the earlier injuries to his left shoulder, he again needed surgery.  Following the surgery, his treating physician concluded that he could no longer perform the

8

essential functions of either the aircraft-mechanic or aircraft-monitor jobs without assistance. Daughtry agreed he could not do either job. Moreover, he began taking powerful pain medications that, under the company's preexisting substance-abuse policies, precluded him from working. He was placed on administrative leave pursuant to the collective-bargaining agreement. As of today, he remains eligible for rehire if a position becomes available that he can carry out with his physical restrictions and medication needs.

Daughtry brought this lawsuit charging that Army Fleet unlawfully failed to accommodate him by failing to create a permanent parts-turn-in job. He claims that, even with his current physical restrictions, he can satisfy parts-turn-in duties if he has assistance with the heavier items; he also charges that all the defendants are liable for conspiring to force him into a job that pays less than the salary to which he is entitled and that his union is liable for failing to

represent adequately his interests throughout the preceding events.

## III. DISCUSSION

### A.

Under the ADA, private employers may not discriminate against an otherwise qualified worker because of a disability. 42 U.S.C. § 12112(a). "Discrimination" under the ADA includes "not making reasonable accommodations to the known physical ... limitations of an otherwise qualified individual with a disability who is an ... employee." 42 U.S.C. § 12112(b)(5)(A). In other words, if an "otherwise qualified" employee with a disability requires reasonable accommodations to perform his job duties, the employer has an affirmative obligation to make those accommodations.

"A reasonable accommodation ... is one that would enable an employee with a disability to enjoy an equal opportunity for benefits and privileges of employment as

are enjoyed by employees without disabilities."   Howell

v. Michelin Tire Corp., 860 F. Supp. 1488, 1492 (M.D.

Ala. 1994) (Thompson, J.).  However, an accommodation is

not "reasonable" if it requires the employer to eliminate

an essential function of a job.  Lucas v. W.W. Grainger,

Inc., 257 F.3d 1249, 1259 (11th Cir. 2001).  Similarly,

reasonable accommodation "does not require that an

employer create a ... new permanent position" for an

employee who cannot carry out the essential functions of

existing jobs.   Howell, 860 F. Supp. at 1492.  By

contrast, "if an employer has a ... vacant permanent

position for which the disabled employee is [able to

carry out the essential functions], it would be a

reasonable accommodation to reassign the employee to that

position," and, therefore, such reassignment would be

mandated by the ADA.   Id.  But, if no such position

exists, the ADA does not require that the employer create

one.  Id.

Here, the defendants have presented evidence showing

that Army Fleet satisfied its duties under the ADA.  The

evidence shows that, after Daughtry's first injury, he was unable to carry out the bulk of his duties as an aircraft mechanic; he could not satisfy the core function of the job, servicing aircrafts.  He was able to satisfy only one of the job's multiple requirements--shelving items, an ancillary task--and even that, only with assistance from coworkers.  Daughtry does not contest these facts.  The ADA does not require Army Fleet to keep Daughtry employed as an aircraft mechanic when no possible accommodation would allow him to carry out the essential functions of the job.  See Lucas, 257 F.3d at 1259.

Moreover, the evidence shows that, unless Army Fleet violates the union agreement by pushing aside employees with more seniority than Daughtry, the company has no need for additional work in parts-turn-in, the sole job function Daughtry can perform to a limited extent.  The ADA does not require that Army Fleet create a new position for which the company has no need, nor does the ADA require that Army Fleet push aside current employees

12

to create a need.  Howell, 860 F. Supp. at 1492; see also
Hoskins v. Sheriff's Dep't, 227 F.3d 719, 730 (6th Cir.
2000) (holding that, on the facts of the case, turning a
temporary "relief position" into a permanent job was not
a reasonable accommodation); Milton v. Scrivner, 53 F.3d
1118, 1125 (10th Cir. 1995) (holding that reasonable
accommodation did not require the employer to violate the
collective-bargaining agreement).

The existence of a reasonable accommodation is an
element of the plaintiff's case under the ADA, and, if
the plaintiff does not put forth evidence showing a
reasonable accommodation, the defendants are entitled to
judgment in their favor.  See Willis v. Conopco, Inc.,
108 F.3d 282, 286 (11th Cir. 1997).  The defendants have
presented evidence that no such reasonable accommodation
exists for Daughtry.  Now, the burden shifts to him to
put forth evidence showing why that is not the case.

In response, Daughtry has submitted to the court over
1,500 pages of evidence and over 100 pages of briefing.
The briefing ranges in its various parts from convoluted

at best to entirely incoherent at worst.  The court has examined the submission for arguments as to the possibility of reasonable accommodation, and the court understands Daughtry to make the following contentions.

First, Daughtry contends that another aircraft mechanic who was injured on the job, John Smith, was permitted to work in parts-turn-in exclusively (or at least nearly exclusively) far longer than was Daughtry. The implication is that Air Fleet's protestations that it could not similarly employ Daughtry in parts-turn-in are pretextual.  See Howell, 860 F. Supp. at 1493 (fact that employees other than plaintiff were afforded temporary light-duty work for far longer period than plaintiff created genuine dispute as to whether employer reasonably accommodated plaintiff with shorter period).  However, Daughtry's purported evidence relating to John Smith falls short for one critical reason: the argument entirely ignores the issue of seniority.  The evidence shows that Smith was more senior in the union than Daughtry, and thus, after the realignment, the more-

14

senior Smith was permitted to keep working the regular work week while the more-junior Daughtry was bumped to odd work week. <u>See</u> Smith Dep. (Doc. No. 125-19) at 18:2-3. Army Fleet could not continue accommodating Daughtry because, after the realignment and Daughtry's move to odd work week, all needed parts-turn-in work was handled by persons with more seniority than Daughtry. The evidence about Smith does nothing to rebut that fact, and, as such, it does not create a genuine dispute as to reasonable accommodations.

Second, Daughtry alleges that there were irregularities in Army Fleet's practices in determining whether the company could continue to accommodate him with parts-turn-in work after the realignment. Daughtry puts forth some vague evidence that the company's human resources department has a policy of "coordinating with the field manager to determine if there is productive work available for an employee with restrictions." Maddox Dep. (Doc. No. 125-1) at 36:10-15. Other testimony provides that the human resources department,

15

before informing Daughtry that the company could no longer accommodate him as it had pre-realignment, first discussed possible alternative accommodations with Rick Davis, Daughtry's field manager while he was in parts-turn-in,  id. at 138:10-139:15, and two other specified individuals, Ed Brown and Darlene Whalen, whose roles in the company are not clear, id. at 163:7-165:1.

Daughtry's essential contention seems to be that these discussions were inadequate and Army Fleet somehow violated its own policies regarding searching for alternative accommodations.  Even if that were the case, however, it, standing alone, would not create a dispute of material fact.   The existence of a reasonable accommodation is an element of the plaintiff's case.  See Willis, 108 F.3d at 286.  To establish that element, it is not enough to show merely that Army Fleet potentially committed a procedural irregularity in its search for accommodations; rather, Daughtry must show that there was an actual, not just hypothetical, reasonable accommodation that could have been taken.  See Milton, 53

16

F.3d at 1125 ("Plaintiffs' final suggestion, that they be allowed to transfer to another job, is also unreasonable.... [The plaintiff] has not provided a description of any other jobs that would accommodate his disability.  He merely speculates that he could probably transfer to something else.").

Daughtry's third argument is that Tammie Maddox, who works in human resources for Army Fleet, "confessed at her deposition that Rick Davis," Daughtry's field manager for some time, "stated [that] he was able to accommodate ... Daughtry as a mechanic assigned to motor pool." Pl.'s Br. (Doc. No. 115) at 18.  If Davis, an Army Fleet field manager, in fact stated that he could accommodate Daughtry, that would obviously create a dispute of material fact.  To show this purported fact, Daughtry cited to, but did not quote, a portion of Maddox's deposition.  The relevant part of the deposition transcript containing Maddox's "confession" states the following:

"Q: Did [Davis] tell you that he was
willing to accommodate [Daughtry] in
motor pool?

"A: I don't remember.

"Q: ... Did you have any communications
with Rick Davis as to whether he could
work at parts turn-in, or other
positions other than parts turn-in, as
a mechanic at Lowe Field prior to
informing Mr. Daughtry of the Hobson's
choice in October of 2008?

"A: What's a Hobson's choice?

"Q: That's a fair statement, Tamm[ie].
I've heard of attorneys call[] it that,
and I'm not real sure what that is.  I
won't even try to explain it to you....
Did Mr. Davis state to you that he could
use him in motor pool?

"A: I don't remember.

"Q: If Mr. Davis says that, do you agree
or disagree with that?

"A: If Mr. Davis said it, I don't argue
with it."

Maddox Dep. (Doc. No. 125-1) at 137:7-140:9.  The obvious

disparity between Maddox's "confession" (which Daughtry

claims happened) and Maddox's actual statements that she

does   not   remember   (which   the   transcript   actually

18

reflects) requires no elaboration.  It is enough to say, this evidence is insufficient to defeat summary judgment.

The final argument the court understands from Daughtry's briefing is that, despite the defendants' statements to the contrary, the company, in fact, replaced him with new hires after he was booted from his position as an aircraft mechanic assigned to part-turn-in duty.  See Pl.'s Br. (Doc. No. 115) at 37.  In other words, Daughtry was replaced with people who, given that they were recently hired, were unquestionably less senior than Daughtry, and, therefore, the company's claimed adherence to the seniority system is mere pretext.  For support, Daughtry cites to the deposition of James Cotter, a union representative, which, according to the brief, is exhibit 22 in the record.  See id.  Exhibit 22 appears to be a handwritten letter.  It seems that Daughtry intended to cite to exhibit 20.  The relevant part of the deposition transcript states:

> "Q: Is it your understanding that actual new hires were put in the position of parts turn-in?

> "A: I do not know that.
>
> "Q: If I were to tell you that was the case, would that surprise you?
>
> "A: No."

Cotter Dep. (Doc. No. 125-20) at 109:5-10.  Again, the court thinks it unnecessary to elaborate on the disparity between the contentions in Daughtry's brief and the reality of the evidence.

The remainder of Daughtry's arguments is either too confusing to understand or, although comprehensible, is not supported by citations to any evidence.  If there is actual evidence of a reasonable accommodation in the record, Daughtry has failed to bring it to the court's attention, and the court will not scour Daughtry's 1,500-page-plus evidentiary submission, unguided by Daughtry himself, for possible supporting evidence.  See Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact ... is genuinely disputed must support the assertion by ... citing to particular parts of materials in the record.") (emphasis added) and (c)(3) ("The court need consider

20

<u>only</u> the cited materials") (emphasis added).   Nor will
the court conjure a dispute of material fact from
counsel's imagination when the cited portions of the
record are contradictory.   As Daughtry failed to show
evidence of reasonable accommodation, an element
essential to his ADA claim,  defendants are entitled to
summary judgment on that claim.   <u>See</u> <u>Celotex Corp.</u>, 477
U.S. at 323.

### B.

Daughtry's complaint, in shotgun fashion, asserts a
bevy of other causes of action all arising out of the
same events already discussed.[1]

First, Daughtry asserts a breach-of-contract claim,
contending that the collective-bargaining agreement

---

1.   <u>See</u> Black's Law Dictionary 1191 (8th ed. 2004)
(defining "shotgun pleading" as "A pleading that
encompasses a wide range of contentions, usu. supported
by vague factual allegations."); <u>Horn v. Bd. of Educ.</u>,
2010 WL 4340786 (M.D. Ala. Oct. 8, 2010) (Thompson, J.)
(discussing shotgun pleading and its "unacceptable
consequences," including "[w]asting scarce judicial
resources").

21

between Army Fleet and the union required the company to provide reasonable accommodations for disabled employees and that the company breached that obligation. For the same reasons already discussed, Daughtry has not put forth evidence tending to show that Army Fleet failed to accommodate him. If the agreement requires accommodations in excess of the ADA, Daughtry has made no attempt to show as much.

Second, Daughtry asserts a right to relief pursuant to the Alabama law doctrine of equitable estoppel. That doctrine provides that, if a person "knowingly communicate[d] something in a misleading way, either by words, conduct, or silence, with the intention that the communication will be acted on [by another person]" and that other person relied upon the misleading communication to his detriment, the person who made the communication may be estopped from proceeding inconsistently with the misleading communication. Lambert v. Mail Handlers Ben. Plan, 682 So. 2d 61, 64 (Ala. 1996). Here, Daughtry contends that the defendants

communicated to him that his position as an aircraft mechanic assigned to parts-turn-in duty would be permanent and that they are therefore estopped from now arguing otherwise. However, he cites no evidence supporting that contention. Moreover, the great weight of the record that the court has examined belies the allegation.

Third, Daughtry's next claim is under the RICO statute. Under RICO, "it is illegal 'for any person ... associated with any enterprise ... to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.'" Williams v. Mohawk Indus., Inc., 465 F.3d 1277, 1282 (11th Cir. 2006) (quoting 18 U.S.C. § 1962(c)). "[I]n order to establish a federal civil RICO violation ..., the plaintiff[] must satisfy four elements of proof: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." Id. (quotation marks and citations omitted). A "pattern of racketeering activity" means at least two or more

criminal acts listed in the RICO statute.  <u>See</u> <u>id</u>.
(citing 18 U.S.C. § 1961(1)).  Fourth, Daughtry makes a
similar claim, invoking the Alabama law doctrine of civil
conspiracy.  A civil conspiracy is an agreement among
multiple persons to commit one or more unlawful acts that
would by themselves give rise to civil liability.  <u>See</u>
<u>Spain v. Brown & Williamson Tobacco Corp.</u>, 872 So. 2d
101, 126 (Ala. 2003).

Daughtry has failed to identify evidence supporting
either RICO or civil conspiracy.  He has not shown any
unlawful acts committed by the defendants (or, for that
matter, any of the claims' other essential elements).
While Daughtry's briefing makes vague allegations of
"extortion," this court has seen nothing supporting that.
The record seems to show that all defendants attempted to
accommodate Daughtry in good faith.  Daughtry's
discontent with the result does not transform an attempt
at accommodation into an illegal act of extortion.  The
same is true of Daughtry's state-court workers'
compensation lawsuit.  Daughtry makes nebulous

24

allegations about improper conduct that occurred in that lawsuit.  As far as this court can tell, the evidence shows that Daughtry was offered a settlement that he accepted and that there was nothing unusual, improper, or unlawful about the deal.  Unless he can show actual evidence otherwise (which he has not), no amount of colorful language in his briefing turns an ordinary settlement transaction into an act of extortion.

Fifth, Daughtry seeks to hold the defendants liable for committing the Alabama law tort of outrage.  To succeed on that claim, Daughtry must show "(1) that the defendant[s] either intended to inflict emotional distress, or knew or should have known that emotional distress was likely to result from [their] conduct; (2) that the defendant[s'] conduct was extreme and outrageous; and (3) that the defendant[s'] conduct caused emotional distress so severe that no reasonable person could be expected to endure it."  Jackson v. Alabama Power Co., 630 So. 2d 439, 440 (Ala. 1993).  Here, Daughtry claims that the defendants' "barbaric means of

25

refusing to accommodate" him make out an outrage claim. Pl.'s Supplemental Br. (Doc. No. 126) at 35. Unsurprisingly, he points to no evidence of barbarism in the record. Likewise, no identified evidence supports Daughtry's two negligence and wantonness claims, one of which is directed at the union and the other at the other defendants. The court is unable to discern what conduct of the defendants Daughtry charges was negligent or wanton.

Sixth, the next asserted claim is invasion of privacy. As the court understands Daughtry's contentions, he seems to premise this claim on two separate incidents. The first incident is, he contends, that the defendants violated his privacy by making certain unspecified statements in the course of judicial proceedings. But, under Alabama law, statements made in the course of judicial proceedings are absolutely privileged, and, therefore, that aspect of his invasion-of-privacy claim fails as a matter of law. See Drees v. Turner, 45 So. 3d 350, 358 (Ala. Civ. App. 2010) (citing

26

O'Barr v. Feist, 296 So. 2d 152 (Ala. 1974)).  The next incident is, he alleges, that the defendants, in the course of attempting to accommodate him, required him to have a physical examination by a doctor and that that examination violated his privacy.  The court sees no aspect of this physical examination that should rise to liability.

Finally, nearing the end of Daughtry's many overlapping claims, his final charge is that the union inadequately represented his interests throughout the relevant events.  Under federal law, labor unions owe a duty of fair representation to their members.  See Vaca v. Sipes, 386 U.S. 171, 177 (1967).  Notwithstanding that duty, "a union is allowed considerable latitude in its representation of employees."  Harris v. Schwerman Trucking Co., 668 F.2d 1204, 1206 (11th Cir. 1982).  "Nothing less than a demonstration that the union acted with reckless disregard for the employee's rights or was grossly deficient in its conduct will suffice to

27

establish" a claim that the union violated its duty of fair representation.  Id. at 1206-07.

Daughtry argues that the union violated the duty in several respects.  The first violation he contends is that, while the union was litigating his case in arbitration, it failed to argue that Army Fleet had violated the ADA and, instead, argued only that the company violated the collective-bargaining agreement's provisions relating to accommodations.  That tactical decision, however, seems entirely reasonable.  The plain language of the collective-bargaining agreement provides that, "The jurisdiction of the arbitrator and his decision shall be confined to a determination of the facts and the interpretation or application of the specific provision of this Agreement at issue....  The arbitrator shall have no authority to interpret any federal or state law."  Collective-Bargaining Agreement (Doc. No. 105-2) at 22.  Even if competent attorneys may differ as to whether the union's tactics were the best choice, it is obvious that the union's conduct was not

28

"grossly deficient" or in "reckless disregard" for Daughtry's rights. <u>Harris</u>, 668 F.2d at 1206-07.

Next, Daughtry complains that, after the arbitrator issued an unfavorable decision, the union failed to sue to vacate the result. That choice of the union also seems entirely reasonable. The collective-bargaining agreement itself provides that the arbitrator's decision "shall be final and binding on the Company, the Union and the employee or employees involved." Collective-Bargaining Agreement (Doc. No. 105-2) at 22. Moreover, even if the union had sued, the suit almost surely would have failed, as arbitration decisions are subject to highly limited judicial review. <u>See</u> <u>Smith v. Babcock & Wilcox Co.</u>, 726 F.2d 1562, 1564 (11th Cir. 1984) ("When a collective bargaining agreement provides a mechanism for grievance settlement through binding arbitration, a decision by the arbitrator may not normally be reviewed in the federal courts."). The union's decision not to sue cannot "conceivably amount to a breach of the Union's duty of fair representation." <u>Rasheed v. International</u>

<u>Paper Co.</u>, 826 F. Supp. 1377, 1388 (S.D. Ala. 1993) (Vollmer, J.); <u>see also</u> <u>Shores v. Peabody Coal Co.</u>, 831 F.2d 1382 (7th Cir. 1987) ("This Circuit has firmly established the rule, however, that a union's failure to contest an arbitration award in court cannot be a breach of the duty of fair representation.").

Lastly, Daughtry charges that the union wrongfully brought to arbitration some, but not all, of the grievances he initiated.   The union replies that Daughtry's multiple grievances were duplicative and that it made a wise strategic decision in opting to arbitrate some grievances, but not the redundant ones.   Based on the evidence before the court, it seems undisputed that "the union met [its] obligation of fair representation by pursuing [the] grievance[s] to a point where further action would have been fruitless.   The union is not under an absolute duty to pursue a grievance through arbitration," especially a grievance duplicative of one already proceeding through arbitration.   <u>Stanley v. Gen.</u>

<u>Foods Corp.</u>, 508 F.2d 274, 275 (5th Cir. 1975).[2]  Daughtry has not shown facts sufficient to support a breach of duty in this regard.

Daughtry has raised several other complaints about his union's performance, but they are all either too unclear to assess or they lack any citation to evidence in the record.

***

Accordingly, the defendants' motions for summary judgment will be granted, with judgment entered in favor of the defendants and against Daughtry.

An appropriate judgment will be entered.

DONE, this the 15th day of February, 2013.

                        <u>    /s/ Myron H. Thompson    </u>
                        UNITED STATES DISTRICT JUDGE

---

2.   In <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1209 (11th Cir. 1981) (<u>en banc</u>), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.